**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CONNEXIONS DATA INC.,<br><br>Plaintiff,<br><br>v.<br><br>ABBOTT LABORATORIES INC., DELL MARKETING L.P., AND NORWIN TECHNOLOGIES LLC,<br><br>Defendants. | Case No. 2:26-cv-07278-ES-AME<br><br>CIVIL ACTION<br><br>Motion Date: October 19, 2026 |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT ABBOTT LABORATORIES INC.'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

**LAW OFFICES OF USMAAN SLEEMI LLC**
*Attorneys for Plaintiff*

Usmaan Sleemi, Esq.
66 Route 17 North, Suite 500
Paramus, NJ 07652
Tel: (973) 866-9415
usleemi@sleemilaw.com

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** .......... 1

**STATEMENT OF RELEVANT ALLEGED FACTS** .......... 3

**STANDARD OF REVIEW** .......... 5

**LEGAL ARGUMENT** .......... 7

**I. CONNEXIONS HAS SUFFICIENTLY PLED A CLAIM FOR UNJUST ENRICHMENT AGAINST ABBOTT (COUNT EIGHT).** .......... 7

A. ABBOTT, A STRANGER TO THE NORWIN AGREEMENTS, CANNOT INVOKE THEM TO DEFEAT PLAINTIFF'S QUASI-CONTRACTUAL AND IMPLIED-CONTRACT CLAIMS. .......... 7

B. THE NORWIN AGREEMENTS DO NOT COVER THE SUBJECT MATTER OF THE DISPUTE. .......... 9

C. CONNEXIONS HAS PLEADED THAT IT EXPECTED REMUNERATION FROM ABBOTT. .......... 10

**II. CONNEXIONS' FRAUD CLAIM (COUNT NINE) SATISFIES RULE 9(b)** .......... 14

A. RULE 9(b) REQUIRES NOTICE, NOT A TRIAL TRANSCRIPT. .......... 14

B. THE SAC PLEADS MORE THAN THIS COURT HELD SUFFICIENT IN *FIMBEL v. FIMBEL DOOR CORP.* .......... 15

C. RULE 9(b) DOES NOT REQUIRE THE SAC TO NAME THE INDIVIDUAL ABBOTT EMPLOYEES WHO SPOKE. .......... 16

D. ABBOTT'S PROMISE IS ACTIONABLE BECAUSE ABBOTT NEVER INTENDED TO HONOR IT. .......... 17

E. REASONABLE RELIANCE IS A FACT-SENSITIVE QUESTION NOT RESOLVABLE ON THE PLEADINGS. .......... 21

**III. CONNEXIONS HAS PLAUSIBLY ALLEGED AN IMPLIED-IN-FACT CONTRACT WITH ABBOTT (COUNT TEN).** .......... 22

A. *MK STRATEGIES, LLC v. ANN TAYLOR STORES CORP.* – ABBOTT'S OWN LEAD CASE – DENIED DISMISSAL ON MATERIALLY IDENTICAL ALLEGATIONS. 22

B. ABBOTT'S DEMAND FOR MATERIAL TERMS IS A DEMAND FOR A WRITTEN CONTRACT. .......... 24

C. THE STATUTE OF FRAUDS DOES NOT BAR COUNT TEN ON THE PLEADINGS. .......... 26

D. CONNEXIONS NEED NOT PLEAD AN AGENT'S AUTHORITY WITH PARTICULARITY. .......... 28

**IV. THE COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM SURVIVES WITH THE CONTRACT CLAIM (COUNT ELEVEN). .......................................... 31**

**V. CONNEXIONS HAS SUFFICIENTLY PLED PROMISSORY ESTOPPEL (COUNT TWELVE). .......................................... 33**

**VI. COUNT THIRTEEN SHOULD BE CONSOLIDATED WITH COUNT TWELVE, NOT DISMISSED. .......................................... 37**

**VII. ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE. .......................................... 38**

**CONCLUSION .......................................... 38**

# TABLE OF AUTHORITIES

## CASES

*Adie v. Stewart*, No. 20-6200, 2020 WL 7488897 (D.N.J. Dec. 21, 2020) .................................. 8

*Alexander v. CIGNA Corp.*, 991 F. Supp. 427 (D.N.J. 1998).................................................... 21

*Amelco Window Corp. v. Fed. Ins. Co.*, 127 N.J. Super. 342 (App. Div. 1974) ......................... 27

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................ 6

*Atchison v. Sears*, 666 F. Supp. 2d 477 (E.D. Pa. 2009) .......................................... 28, 29, 30, 31

*Baer v. Chase*, 392 F.3d 609 (3d Cir. 2004) .................................................................. 24, 25, 26

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................ 6

*Callano v. Oakwood Park Homes Corp.*, 91 N.J. Super. 105 (App. Div. 1966) ............. 11, 12, 13

*Castro v. NYT Television*, 370 N.J. Super. 282 (App. Div. 2004) ........................................ 10, 11

*Coastal Group Coastal Group, Inc. v. Westholme Partners*, No. 94-3010, 1996 WL 33545605 (D.N.J. Oct. 3, 1996) ............................................................................ 17, 18, 20, 26, 32, 35, 37

*Comprehensive Spine Care, P.A. v. Oxford Health Insurance, Inc.*, No. 18-6520, 2018 WL 6445593 (D.N.J. Dec. 10, 2018) ............................................................................................. 25

*County of Essex v. Aetna Inc.*, No. 15-7207, 2018 WL 6584920 (D.N.J. Dec. 13, 2018)............ 16

*Cushman & Wakefield of N.J., LLC v. Wyndham Destinations*, Inc., No. 21-6237, 2021 WL 3030337 (D.N.J. July 16, 2021) ............................................................................................. 8

*East Orange Board of Education v. New Jersey Schools Schools Construction Corporation*, 405 N.J. Super. 132 (App. Div. 2009)........................................................................................ 33, 36

*Evancho v. Fisher*, 423 F.3d 347 (3d Cir. 2005) ........................................................................... 6

*Fimbel v. Fimbel Door Corp.*, No. 14-1915, 2014 WL 6992004 (D.N.J. Dec. 10, 2014) .... 15, 16, 18, 19, 20

*Fleming Cos. v. Thriftway Medford Lakes, Inc.*, 913 F. Supp. 837 (D.N.J. 1995) ...................... 21

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009)........................................................... 6

*Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) ............................................... 14, 16

*Genesis Laboratory Management LLC v. United Healthcare Services, Inc.*, No. 21-12057, 2025 WL 325840 (D.N.J. Jan. 29, 2025) .......................................................................................... 26

*Grayson v. Mayview State Hosp.*, 293 F.3d 103 (3d Cir. 2002) ................................................. 38

*Gutman v. Howard Savings Bank*, 748 F.Supp. 254 (D.N.J. 1990)............................................ 14

*Haghighi v. Horizon Blue Cross Blue Shield of New Jersey*, No. 19-20483, 2020 WL 5105234 (D.N.J. Aug. 31, 2020) ........................................................................................................... 36

*Hedges v. United States*, 404 F.3d 744 (3d Cir. 2005). ................................................................. 7

*Hillsborough Rare Coins, LLC v. ADT LLC*, No. 16-916, 2017 WL 1731695 (D.N.J. May 2, 2017)........................................................................................................... 33

*Howard M. Schoor Associates, Inc. v. Holmdel Heights Constr. Co.*, 68 N.J. 95 (1975) ...... 27, 28

*Impact Protective Equipment, LLC v. XTech Protective Equipment, LLC*, No. A-0879-19, 2021 WL 1395618 (App. Div. Apr. 14, 2021)................................................................... 7, 9

*In re Aetna UCR Litigation*, No. 07-3541, 2015 WL 3970168 (D.N.J. June 30, 2015)................ 8

*In re Prudential Insurance Co. of America Sales Practices Litigation*, 975 F. Supp. 584 (D.N.J. 1996)........................................................................................................... 21

*Kernahan v. Home Warranty Administrator of Florida, Inc.*, 236 N.J. 301 (2019)..................... 26

*Klein v. General Nutrition Companies, Inc.*, 186 F.3d 338 (3d Cir. 1999) ........................... 16, 17

*Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993)................................................ 20

*Malaker Corp. v. First Jersey National Bank*, 163 N.J. Super. 463 (App. Div. 1978) ................ 35

*MK Strategies, LLC v. Ann Taylor Stores Corp.*, 567 F. Supp. 2d 729 (D.N.J. 2008) 8, 11, 12, 22, 23, 24, 31

*Palisades Props., Inc. v. Brunetti*, 44 N.J. 117 (1965) ............................................................... 32

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008)....................................................... 6

*Pop's Cones, Inc. v. Resorts Int'l Hotel, Inc.*, 307 N.J. Super. 461 (App. Div. 1998) ... 21, 22, 34, 35

*Rivard v. Trip Mate, Inc.*, No. 22-1554, 2023 WL 2624721 (3d Cir. Mar. 24, 2023)................... 8

*Rose v. Ferrari North America, Inc.*, No. 21-cv-20772, 2022 WL 14558880 (D.N.J. Oct. 25, 2022)............................................................................................................. 8

*Sapta Global, Inc. v. Cilicorp*, LLC, No. 13-3698, 2015 WL 1469600 (D.N.J. Mar. 30, 2015) . 27

*SAT Agiyar, LLC v. 7-Eleven, Inc.*, No. 19-19994, 2020 WL 3546821 (D.N.J. June 30, 2020) .. 16

*Scagnelli v. Schiavone*, 538 F. App'x 192 (3d Cir. 2013) ......................................................... 36

*Scheuer v. Rhoades*, 416 U.S. 232 (1974) ..................................................................................... 6

*Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786 (3d Cir. 1984) ... 14

*Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 420 (1997) ................................................ 32

*Suburban Transfer Serv., Inc. v. Beech Holdings, Inc.*, 716 F.2d 220 (3d Cir. 1983).................... 9

*Van Dam Egg Co. v. Allendale Farms, Inc.*, 199 N.J. Super. 452 (App. Div. 1985) ................... 18

*VRG Corporation v. GKN Realty Corp.*, 135 N.J. 539 (1994) ............................................... 13, 14

*Wade v. Kessler Institute*, 172 N.J. 327 (2002) ........................................................................... 32

*Willekes v. Serengeti Trading Co.*, No. 13-7498, 2016 WL 5334522 (D.N.J. Sept. 22, 2016).... 37

**STATUTES**

N.J.S.A. § 25:1-15 ........................................................................................................ 27

**RULES**

Fed. R. Civ. P. 8 ........................................................................................................ 6, 31, 32
Fed. R. Civ. P. 9 ........................................................................ 1, 2, 3, 14, 15, 16, 17, 19
Fed. R. Civ. P. 12 ........................................................................................ 1, 5, 15, 19, 24

**TREATISES**

2 Corbin on Contracts (1950) ........................................................................................ 27

Plaintiff Connexions Data Inc. ("Connexions" or "Plaintiff") respectfully submits this brief in opposition to Defendant Abbott Laboratories Inc.'s ("Abbott") motion to dismiss Plaintiff's Second Amended Complaint ("SAC") pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

## PRELIMINARY STATEMENT

Abbott's motion rests on a single premise, repeated on nearly every page: that because Abbott never signed a contract with Connexions, it has no place in this dispute. That is the premise of Connexions' claims against Abbott, not an answer to them. The counts against Abbott sound in quasi-contract, implied contract, equity and fraud precisely because no written instrument captures what Abbott demanded and what Abbott promised.

The SAC alleges a straightforward story. Abbott engaged Dell to replace the servers at its data centers and migrate it from UNIX to Linux, for a fixed price. Before committing, Connexions scoped the project with Abbott directly and concluded that Dell had badly underestimated its time and cost, in part because Abbott kept enlarging the work. Dell's internal policies, not Connexions' preference, then dictated that the engagement be papered through Norwin Technologies LLC ("Norwin"), a pass-through vendor. On the first day of performance, Abbott imposed hundreds of hours of previously undisclosed mandatory training; it compelled two unbudgeted trips to its Illinois campus; and it expanded phase five from four weeks to roughly seventeen. When Connexions told Abbott in a series of management-level meetings that the expanded work far exceeded the Task Order and would require additional compensation, Abbott's representatives directed Connexions to keep working and to hire more staff, and assured Connexions that Abbott itself would pay for the additional work if Dell did not – while knowing that Abbott would never approve the written change order that was the only mechanism by which

anyone would be obligated to pay. Connexions kept working, hired the staff, and completed more than half the project, including the vastly expanded phase five. Abbott then terminated it, having paid approximately $761,449.27 – far below the fair market value of what it received.

Abbott asks the Court to dismiss all six counts against it on the pleadings and with prejudice. Its arguments reduce to five. First, Abbott says the Norwin agreements bar every quasi-contractual and implied-contract claim because an express contract governs the subject matter – even though Abbott is a stranger to those agreements and tells the Court it has never seen them. Second, Abbott says Connexions never expected payment from Abbott, because it looked to Norwin and, as a contingency, to Dell. Third, Abbott says no implied-in-fact contract can exist absent a pleaded price, payment schedule and duration, that the Statute of Frauds bars any promise to answer for Dell's debt, and that Connexions has not pleaded who at Abbott could bind it. Fourth, Abbott says its assurance was too indefinite to support estoppel and, being a promise about the future, cannot be fraud. Fifth, Abbott says the fraud claim lacks the particularity Rule 9(b) demands and that Connexions' reliance was unreasonable as a matter of law.

Each argument fails, and several fail on the authorities Abbott itself supplies. The rule that an express contract forecloses quasi-contract protects the parties to that contract; it has never allowed a non-party to invoke someone else's agreement as a shield. Abbott's own lead case dismissed quasi-contract counts only because the plaintiff and that defendant conceded a contract between themselves governing their entire dispute, and it distinguished the very decision Abbott calls its best authority on the contract count – a decision that denied dismissal on materially identical allegations and refused the defendant's demand for the same particulars Abbott demands here. The expectation element is stated in the disjunctive, and a party told in meetings that Abbott would pay it directly if Dell did not plainly expected payment from Abbott. Demanding a price

term, a payment schedule and a duration is a demand for a written contract, which would make the implied-in-fact doctrine a nullity; New Jersey infers the promise from conduct, and the conduct is pleaded in detail. And a promise of future performance is actionable when the promisor never intended to keep it: Abbott's simultaneous refusal to issue the one instrument that could have funded payment is evidence of exactly that. Rule 9(b) requires notice, not a trial transcript – the pleading identifies the meetings, their participants, their purpose, their four-month window, and the words spoken.

A large part of Abbott's motion is addressed not to the SAC but to a different document: no fewer than a dozen times, Abbott cites Connexions' brief opposing Dell's motion to dismiss and treats sentences written about Dell as binding admissions about Abbott. A brief is not a pleading, and a plaintiff may plead in the alternative against two defendants who each insist the other is responsible. What remains asks the Court to weigh competing inferences, to decide the reasonableness of Connexions' reliance before any discovery, and to treat the absence of trial-ready detail as a pleading defect – each of which inverts the standard governing this motion.

At bottom, Abbott's position is that an end client may scope a project directly with a subcontractor, enlarge the work far beyond anything the parties agreed, direct the subcontractor to keep performing and to hire additional staff, promise to pay for the additional work itself, accept more than half the project, and then escape all accountability by pointing to a contract it never signed and says it has never read. That is not the law of New Jersey. Abbott's motion should be denied in its entirety.

## STATEMENT OF RELEVANT ALLEGED FACTS

The facts relevant to this motion are fully set forth in Plaintiff's SAC. Connexions alleges in the SAC:

**A. Abbott Scoped The Project Directly With Connexions And Kept Expanding It.**

- In or around mid-2024, Abbott entered into an agreement with Dell to replace the servers at Abbott's data centers and to migrate Abbott from UNIX to Linux. SAC ¶ 7. Dell gave Abbott a fixed price for the project. *Id.* ¶ 24.

- Before committing to the project, Connexions' chief group technology officer told Dell that Connexions "would need to meet with Abbott directly." *Id.* ¶ 22. Connexions then scoped the project "including [by] discussing the project with Abbott directly," and determined that Dell had "severely underestimated the time and cost" of the work and that, "during its own discussions with Abbott, Abbott had kept increasing the scope of the work to be performed." *Id.* ¶ 25; *see also id.* ¶ 27.

- Because of Dell's internal policies, Connexions could be retained only through a preferred vendor, and Dell had Connexions enter into a Master Subcontracting Agreement ("MSA") with Norwin, "a pass-through entity." *Id.* ¶¶ 33-34. The MSA "provided that a Task Order would establish the precise services to be performed and payments to be made." *Id.* ¶ 35. The Task Order recited that Connexions "will be working on Symphony and AV SAP project at the direction of . . . Dell/EMC and end client, Abbott Laboratories," for $3,310,649.00. *Id.* ¶ 37.

**B. Abbott Imposed Unbudgeted Training, Travel, And Scope On Connexions.**

- "On the day that Connexions was supposed to start working on the project, Abbott informed Connexions, for the first time, that Connexions employees and consultants working on the project were required to undergo hundreds hours of trainings – including numerous unnecessary and irrelevant trainings such as brand awareness training, materials handling training, and procurement training – before they would even be allowed to start working on the project." *Id.* ¶ 45. That "added at least two additional weeks to the project timeline and added $147,330.00 (additional labor costs) to Connexions' costs, which Connexions did not budget for." *Id.* ¶ 46.

- "[T]o expedite the training, Abbott directed Connexions employees and consultants to cheat on some of the trainings by downloading PDFs of the training materials and then signing electronic acknowledgments saying that they had completed the training, even though they had not done so." *Id.* ¶ 47.

- "Abbott constantly changed the scope of work," *id.* ¶ 49, and "forced Connexions employees and consultants working on the project to make two additional on-site trips to its Abbott Park, Illinois campus," *id.* ¶ 51. Those trips "were outside the agreed-upon scope of work, caused further project delays, and resulted in additional scope changes, none of which were compensated via a change order or covered by the promised contingency fund." *Id.* ¶ 52.

- Phase five was scoped as "a four-week effort with a defined set of deliverables," *id.* ¶ 54, but "was repeatedly and unilaterally expanded by Abbott through material changes

in requirements and deliverables," extending it "from the originally agreed four weeks to approximately 17 weeks." *Id.* ¶ 55.

**C. Abbott Directed Connexions To Keep Working And Promised To Pay It Directly.**

- "Multiple meetings took place between the management team of Connexions and the respective representatives of Abbott and Dell during the period from January 2025 and April 2025 to address these scope increases." *Id.* ¶ 57.

- "During those meetings, Connexions repeatedly made it clear to Dell and Abbott that the expanded requirements far exceeded the scope of the Task Order and that it would require additional compensation for the increased work and expenditures. Despite this, Dell and Abbott repeatedly directed Connexions to continue performance and to bring on additional staff to handle the increased scope of the project and assured Connexions that it would receive additional compensation for the increased work and expenditures. Moreover, Abbott assured Connexions that it would receive additional compensation for the increased work and expenditures directly from Abbott if it did not receive it from Dell." *Id.* ¶ 58.

- "Both Dell and Abbott knew, however, that they had no intention of providing additional compensation for the expanded work without a formal, written change order, which they refused to provide." *Id.* ¶ 59; *accord id.* ¶ 127.

- "Relying on these representations, Connexions took on the additional work and expenditures, including the hiring of additional staff." *Id.* ¶ 60. Connexions had been requesting throughout that the project be suspended "until the scope changes were formally recognized and funded," *id.* ¶ 56, and its management was considering "suspension or withdrawal from the project due to excessive costs and material deviation from the original phase five scope," *id.* ¶ 64.

**D. Abbott Terminated Connexions After Taking More Than Half The Project.**

- Connexions completed phase five on or around April 24, 2025. *Id.* ¶ 65. On or around April 30, 2025, "Dell informed Connexions that Abbott had decided to terminate Connexions' services." *Id.* ¶ 66.

- At termination Connexions "had completed more than 50% of the project's total work, including the vastly expanded phase five," *id.* ¶ 67, but had been paid only approximately $761,449.27 – "an amount far below the fair market value of the services that Connexions rendered to Abbott," *id.* ¶ 68 – leaving a shortfall of at least $198,638.94 on the first five phases alone, "exclusive of the additional work performed." *Id.* ¶¶ 69-71.

## <u>STANDARD OF REVIEW</u>

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept all well-pleaded

allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005). It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

A district court, in weighing a motion to dismiss, asks " 'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n. 8 (2007) (quoting *Scheuer v. Rhoades*, 416 U.S. 232, 236 (1974)); *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . . " (citation omitted)). Under the *Twombly/Iqbal* standard, the Third Circuit has instructed a two-part analysis. First, a claim's factual and legal elements should be separated; a "district court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009) (internal citation omitted).

Second, a district court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' " *Id.* at 211 (internal quotation and citation omitted). "[A] complaint must do more than allege the plaintiff's entitlement to relief." *Id.; see Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) ("The Supreme Court's *Twombly* formulation of the pleading standard can be summed up thus: 'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." (quoting *Twombly*, 550 U.S. at 556)). The defendant bears

the burden of showing that no claim has been presented. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

## LEGAL ARGUMENT

### I. CONNEXIONS HAS SUFFICIENTLY PLED A CLAIM FOR UNJUST ENRICHMENT AGAINST ABBOTT (COUNT EIGHT).

#### A. ABBOTT, A STRANGER TO THE NORWIN AGREEMENTS, CANNOT INVOKE THEM TO DEFEAT PLAINTIFF'S QUASI-CONTRACTUAL AND IMPLIED-CONTRACT CLAIMS.

Abbott's first argument is that "unjust enrichment is unavailable where there is an express contract concerning the same subject matter," and that the Connexions-Norwin MSA and Task Order are that contract. Def.'s Br. at 8-9. The rule Abbott invokes, however, only applies to parties to the contract. Its rationale is that a party who bargained for a remedy may not discard the bargain in favor of a better equitable one. That rationale has no application to a defendant who was not part of the bargain. "When parties do not have an express contract governing their relationship, the law allows for quasi-contractual remedies, such as unjust enrichment." *Impact Protective Equipment, LLC v. XTech Protective Equipment, LLC*, No. A-0879-19, 2021 WL 1395618, at *12 (App. Div. Apr. 14, 2021).

*Impact Protective Equipment* is directly on point. There, the Appellate Division reversed the dismissal of an unjust enrichment claim, holding that an operating agreement between the plaintiff and one defendant did not bar an unjust enrichment claim against other defendants who were not parties to that agreement:

> We reject the conclusion that the existence of an operating agreement bars Impact from asserting a quasi-contractual unjust enrichment claim. If this agreement exists, it would only establish a contractual relationship between Impact and Ted, who was one of two members of Impact. Since the other defendants were not members or employees of Impact, the operating agreement would not address their relationship with Impact.

*Id.* at *12.

Moreover, Abbott's own authority, *Cushman & Wakefield of N.J., LLC v. Wyndham Destinations*, Inc., No. 21-6237, 2021 WL 3030337 (D.N.J. July 16, 2021), makes the point for Connexions. In *Cushman & Wakefield*, this Court dismissed the quasi-contract counts, but only because "both parties acknowledge[d] that there existed between them at all relevant times a valid and enforceable contract governing Defendant's alleged conduct," and because the non-contract claims were "based on the same facts and legal duties" as the plaintiff's contract claim. *Cushman & Wakefield*, 2021 WL 3030337, at *2. Critically, the Court then distinguished the case from *MK Strategies, LLC v. Ann Taylor Stores Corp.*, 567 F. Supp. 2d 729 (D.N.J. 2008) and *Adie v. Stewart*, No. 20-6200, 2020 WL 7488897 (D.N.J. Dec. 21, 2020) on the express ground that "the parties in each of those cases did not concede that a valid and enforceable contract governed the entirety of their dispute." *Id.* at *3. Connexions and Abbott have no express contract between them, and Abbott concedes that fact in its opening line. *Cushman & Wakefield* therefore places this case on *MK Strategies* side of the line that Abbott's own brief draws.

Abbott's remaining cases on this point are suits between contracting parties. *See Rivard v. Trip Mate, Inc.*, No. 22-1554, 2023 WL 2624721, at *1 (3d Cir. Mar. 24, 2023) (asking whether "an enforceable contract between the parties foreclosed the unjust enrichment claim"); *Rose v. Ferrari North America, Inc.*, 2022 WL 14558880 (D.N.J. Oct. 25, 2022). That leaves *In re Aetna UCR Litigation*, 2015 WL 3970168 (D.N.J. June 30, 2015) as the single case Abbott cites for the proposition that "[a] claim for unjust enrichment, even against a third party, cannot proceed when there is an express agreement between two parties governing the subject matter of the dispute." Def.'s Br. at 10 (internal quotation marks and citation omitted). As Abbott concedes, *In re Aetna* applied New York law. *Id.* at 9. On the precise question presented here – whether a non-signatory

may invoke a contract between others as a bar to quasi-contractual claims against itself – New Jersey law has spoken, and it has spoken the other way. *See Impact Protective Equipment LLC*, 2021 WL 1395618, at *12. Abbott's effort to distinguish *Impact Protective* on the theory that the agreement there "did not govern the relationship or the issues in dispute as to the non-party defendants," Def.'s Br. at 11, describes this case exactly: the Norwin agreements govern the relationship between Connexions and Norwin. They do not govern Abbott's relationship with anyone.

**B. THE NORWIN AGREEMENTS DO NOT COVER THE SUBJECT MATTER OF THE DISPUTE.**

Even if a non-signatory could invoke a contract between others as a bar to quasi-contractual claims against it, the rule applies only where an express contract covers the identical subject matter of the dispute. *Suburban Transfer Serv., Inc. v. Beech Holdings, Inc.*, 716 F.2d 220, 227 (3d Cir. 1983). Abbott argues that requirement is satisfied because "the Norwin contract expressly covers the 23 phases anticipated for the Abbott project and Dell's implied-in-fact contract covers any alleged out-of-scope work." Def.'s Br. at 10. The second half of that sentence gives the argument away: Abbott is not pointing to an **<u>express</u>** contract covering the out-of-scope work. It is pointing to a contract Connexions alleges was implied in fact with a different defendant, and asking the Court to treat Connexions' alternative allegation against Dell as a bar to Connexions' unjust enrichment claim against Abbott. As pointed out above, even if a non-signatory could invoke a contract between others as a bar to quasi-contractual claims against it, the rule applies only where an **<u>express</u>** contract covers the identical subject matter of the dispute express contract.

Moreover, because the out-of-scope work Abbott demanded falls outside the subject matter of the Connexions-Norwin agreements as pleaded, the existence of those agreements does

not bar Connexions from seeking equitable relief against Abbott. As pleaded, the Task Order fixed a price of $3,310,649.00 for a defined set of 23 phases. SAC ¶¶ 37, 42. Count Eight does not seek that money from Abbott. It seeks the value of work performed outside that scope at Abbott's direction: hundreds of hours of mandatory Abbott training that added $147,330.00 in unbudgeted labor, *id.* ¶¶ 45-46, 119; two additional on-site trips that were "outside the agreed-upon scope of work," *id.* ¶¶ 51-52, 119; approximately thirteen additional weeks of phase-five work driven by Abbott's "material changes in requirements and deliverables," *id.* ¶¶ 55, 119; and "the services of additional staff hired at Abbott's insistence," *id.* ¶ 119. The SAC alleges in terms that this work "far exceeded the scope of the Task Order," *id.* ¶ 58, that it "fell outside the scope of the Task Order," *id.* ¶ 119, and that Connexions "was forced to perform substantial work outside the agreed upon scope without compensation," *id.* ¶ 64.

Abbott responds that "Connexions concedes that all 23 project phases were covered by the express contract between Connexions and Norwin." Def.'s Br. at 11. Connexions does concede that, but it is beside the point. The allegation is that Abbott demanded work the 23 phases did not include. At a minimum, whether the Norwin agreements reach the disputed work cannot be resolved against Connexions on the pleadings.

### C. CONNEXIONS HAS PLEADED THAT IT EXPECTED REMUNERATION FROM ABBOTT.

Abbott's independent argument is that Connexions "cannot plausibly allege that it expected remuneration from Abbott" because it "at all times expected payment from Norwin, or as a contingency, Dell." Def.'s Br. at 2, 12-15. The element is stated disjunctively and Abbott quotes only the first half of the element: a plaintiff satisfies it where " 'the plaintiff expected remuneration from the defendant, or if the true facts were known to [the] plaintiff, he would have expected remuneration from [the] defendant, at the time the benefit was conferred.' " *Castro v.*

*NYT Television*, 370 N.J. Super. 282, 299 (App. Div. 2004) (quoting *Callano v. Oakwood Park Homes Corp.*, 91 N.J. Super. 105, 109 (App. Div. 1966)).

Connexions satisfies the element on the face of the SAC. Abbott "assured Connexions that it would receive additional compensation for the increased work and expenditures directly from Abbott if it did not receive it from Dell." SAC ¶ 58. A party told by Abbott, in meetings with Abbott's representatives, that Abbott itself would pay if Dell did not, plainly expected remuneration from Abbott. Connexions further alleges that it "relied on these representations" in taking on the additional work and hiring additional staff. *Id.* ¶ 60.

*MK Strategies, LLC v. Ann Taylor Stores Corp.*, 567 F. Supp. 2d 729 (D.N.J. 2008) is directly on point and resolves this argument against Abbott. There, a subcontractor, MK Strategies, LLC ("MK Strategies"), performed software work for Ann Taylor Stores Corporation ("Ann Taylor"), under a subcontract with The Tower Group, Inc. ("Tower"), who Ann Taylor had contracted with to perform certain software services for Ann Taylor. *Id.* at 732. MK Strategies alleged that "Ann Taylor, through its authorized representatives, promised to make payment directly to MK Strategies for its work under the Tower subcontract, if MK Strategies was not paid by Ann Taylor through Tower." *Id.* at 734. The Court held that MK Strategies had pled sufficient facts to establish the second element of an unjust enrichment claim, i.e. that it expected remuneration directly from Ann Taylor:

> MK now alleges that authorized representatives from Ann Taylor agreed to pay MK directly for its work if Tower failed to pay MK. By amending its complaint to include these additional details, MK has pled sufficient facts to establish that it expected remuneration directly from Ann Taylor for its work under the main contract . . . .

*Id.* at 735.

The Court therefore denied Ann Taylor's motion to dismiss the unjust enrichment count against it. *Id.* The allegation in paragraph 58 of SAC is the exact same allegation. Indeed,

paragraph 58 of the SAC alleges that Abbott assured Connexions that it would receive additional compensation for the increased work and expenditures directly from Abbott if it did not receive it from Dell. *MK Strategies* also states the governing principle that Abbott's brief never confronts: "**where the primary beneficiary of a contract undertakes additional obligations to a subcontractor, the subcontractor may recover on the bases of those additional obligations from the primary beneficiary of that contract.**" *Id.* at 734. Abbott is the primary beneficiary of the Dell contract. The SAC alleges that Abbott undertook additional obligations to Connexions. That is exactly the situation that MK Strategies describes.

*Callano*, 91 N.J. Super. 105, on which Abbott leans heavily, confirms the point by contrast, though Abbott's description of it reverses the parties. Abbott writes that "[t]he nursery had contracted with the developer – not with the individual home buyers who ultimately purchased the properties," and that when "the developer failed to pay the nursery for its work, the nursery sued the home buyers." Def.'s Br. at 9. The opposite occurred. The nurserymen contracted with Bruce Pendergast ("Pendergast"), the individual who had agreed to buy a house from the developer, Oakwood Park Homes Corp. ("Oakwood"), and planted shrubbery "pursuant to a contract with Pendergast." *Callano*, 91 N.J. Super. at 107. Pendergast died without paying, his purchase contract was cancelled, and Oakwood – the developer – resold the property with the shrubbery in place. *Id.* at 107-108. The nurserymen sued Oakwood for unjust enrichment, and the Appellate Division reversed a judgment in their favor. *Id.* at 110.

The Appellate Division held that "plaintiffs entered into an express contract with Pendergast and looked to him for payment. They had no dealings with [Oakwood], and did not expect remuneration from it when they provided the shrubbery." *Id.* at 109 (emphasis added). The court emphasized that "quasi-contract cases involve either some direct relationship between

the parties or a mistake on the part of the person conferring the benefit." *Id.* And it distinguished a case permitting recovery "because of a fraud perpetrated by defendants," noting that "[t]here is no contention of fraud on the part of Oakwood in the instant case." *Id.* at 110.

Every fact that defeated the unjust enrichment claim in *Callano* is reversed here. The *Callano* plaintiffs "had no dealings" with Oakwood; Connexions met with Abbott directly to scope the project before committing to it, SAC ¶¶ 22, 25, took Abbott's training, *id.* ¶¶ 45-47, traveled to Abbott's campus at Abbott's insistence, *id.* ¶¶ 50-52, and met with Abbott's representatives repeatedly over four months, *id.* ¶ 57. Oakwood requested nothing and promised nothing – it simply found shrubbery growing on land it happened to own; Abbott demanded the training, demanded the trips, unilaterally expanded phase five, directed Connexions to hire staff, and promised to pay. *Id.* ¶¶ 45, 49, 51, 55, 58. Oakwood had no knowledge of the nurserymen's non-payment, *Callano*, 91 N.J. Super. at 107; Abbott was told repeatedly, in meetings, that the expanded requirements "would require additional compensation." SAC ¶ 58. And *Callano* turned in part on the absence of any fraud allegation. Here, Count Nine pleads one.

*Callano* concluded on the observation that quasi-contract "was developed under the law to provide a remedy where none existed," and that the nurserymen had one – an action against Pendergast's estate, the party that had actually promised to pay them. *Callano*, 91 N.J. Super. at 110. Connexions asks for no substitution of debtors. It does not seek to hold Abbott liable for Norwin's obligation to pay the Task Order price. It seeks the value of work outside the Task Order that Abbott demanded and promised to pay for.

*VRG Corporation v. GKN Realty Corp.*, 135 N.J. 539 (1994), is also distinguishable. *VRG* was decided after trial, on a developed record. *Id.* at 543. The Court held that the purchaser was not unjustly enriched because it "pa[id] fair market value for the shopping center" and so "did not

receive an unexpected benefit or undeserved windfall." *Id.* at 555. The broker there conceded the point: "Backos herself acknowledged that the purchase price of the property reflected its fair market value." *Id.* at 555-556. Here the SAC alleges the opposite, and the Court must accept it: Abbott "retained the benefits of Plaintiff's services, including the deliverables from the expanded phase five, while paying only a fraction of the fair market value of the labor and resources Plaintiff provided," SAC ¶ 121, and the sums Connexions received were "far below the fair market value of the services that Connexions rendered to Abbott," id. ¶ 68. *VRG* is also opposite on the promise: there, "GKN never told VRG that it would pay the commissions." *VRG Corporation*, 135 N.J. at 557 (intenral quotation marks omitted). Here, Abbott is alleged to have said precisely that. SAC ¶ 58.

## II. CONNEXIONS' FRAUD CLAIM (COUNT NINE) SATISFIES RULE 9(b).

### A. RULE 9(b) REQUIRES NOTICE, NOT A TRIAL TRANSCRIPT.

Abbott recites the "who, what, when, where and how" formulation and then demands each item in isolation. Def.'s Br. at 15-17. The Third Circuit has adopted a flexible approach under which allegations of "date, place or time" suffice, "but nothing in the rule requires them," and plaintiffs "are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir. 1984). Abbott's own authority says the same: a plaintiff must "plead or allege the date, time and place of the alleged fraud **or otherwise inject precision or some measure of substantiation into a fraud allegation**." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (emphasis added). "[T]he purpose of Rule 9(b) is only to put defendants on notice of the specific misrepresentations alleged against them, not to test the factual support for those allegations." *Gutman v. Howard Savings Bank*, 748 F.Supp. 254, 257

(D.N.J. 1990). Rule 9(b) further provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

### B. THE SAC PLEADS MORE THAN THIS COURT HELD SUFFICIENT IN *FIMBEL v. FIMBEL DOOR CORP.*

This Court has already held that considerably less than what the SAC alleges satisfies Rule 9(b). *Fimbel v. Fimbel Door Corp.*, No. 14-1915, 2014 WL 6992004 (D.N.J. Dec. 10, 2014), was decided on the pleadings on a Rule 12(b)(6) motion in which this Court applied Rule 9(b) to the fraud count. There, this Court held Rule 9(b) satisfied by allegations of when the misrepresentation was made ("in 2012, on the eve of the sale [of the corporation's property]"), to whom it was made ("[the corporation's] shareholders"), and what was said ("that dividends would be paid soon after closing"). *Fimbel*, 2014 WL 6992004 at *5. No calendar date, no clock time, no place, and no individually named recipient were required.

Measured against *Fimbel*, the SAC supplies a great deal more. It does not allege fraud at large. It fixes the occasion: "[m]ultiple meetings . . . between the management team of Connexions and the respective representatives of Abbott and Dell," convened for the specific purpose of "address[ing] these scope increases." SAC ¶ 57. It fixes the window: "from January 2025 and April 2025," *id.*, and "from January 2025 through April 2025," *id.* ¶ 125 – a bounded four-month period, where *Fimbel* required no more than "in 2012, on the eve of the sale." It fixes the channel: management-level meetings between the two companies' representatives. *Id.* ¶ 57. It fixes the content, in quoted terms: Abbott "assured Connexions that it would receive additional compensation for the increased work and expenditures directly from Abbott if it did not receive it from Dell." *Id.* ¶ 58. It fixes the subject matter of the promise: "the vastly expanded scope of work for phase five and . . . the hiring of additional personnel." *Id.* ¶ 125. It fixes falsity: Abbott "had no intention of providing additional compensation for the expanded work without a formal,

written change order, which it refused to provide," *id.* ¶ 127, and "knew these representations were false when made," *id.* ¶ 126. And it fixes the inducement: Abbott made the statements "to induce Plaintiff to continue performance and incur substantial additional costs when the project's scope expanded, thereby ensuring the project continued without interruption for Abbott's benefit." *Id.* ¶ 128.

That is a far cry from *County of Essex v. Aetna Inc.*, No. 15-7207, 2018 WL 6584920 (D.N.J. Dec. 13, 2018), Abbott's principal case, where the complaint alleged only that "Aetna represented to the County" certain things "through communications and contacts" – no identified negotiators on either side, no channel, no time frame, and no described occasion. *Id.* at *7. It is also unlike *SAT Agiyar, LLC v. 7-Eleven, Inc.*, 2020 WL 3546821 (D.N.J. June 30, 2020), where the misrepresentations were alleged to have been made "at some time." *Id.* at *5. Here the pleading identifies a bounded four-month window, a defined series of meetings convened for a stated purpose, the two sets of participants, and the words spoken.

**C. RULE 9(b) DOES NOT REQUIRE THE SAC TO NAME THE INDIVIDUAL ABBOTT EMPLOYEES WHO SPOKE.**

Abbott's remaining particularity argument is that the SAC does not name the individual Abbott employees who gave the assurance. Def.'s Br. at 16 (citing *Klein v. General Nutrition Companies, Inc.*, 186 F.3d 338, 345 (3d Cir. 1999)). Rule 9(b) imposes no such requirement. The test is whether the pleading "inject[s] precision or some measure of substantiation into a fraud allegation," *Frederico*, 507 F.3d at 200, so that the defendant is on notice of "the precise misconduct with which [it is] charged," *Fimbel*, 2014 WL 6992004, at *5. The SAC attributes the assurance to Abbott, acting through "the respective representatives of Abbott" whom Abbott itself sent to a defined series of management-level meetings, convened for the stated purpose of addressing the scope increases, within a bounded four-month window – and it quotes what was

said. SAC ¶¶ 57-58. Abbott needs nothing further to identify its own attendees at its own meetings, or to answer what it is alleged to have told Connexions in them.

*Klein* does not hold otherwise. It is a securities case governed not only by Rule 9(b) but by the additional pleading requirements of Section 21D(b) of the Exchange Act, 15 U.S.C. § 78u-4(b). *Klein*, 186 F.3d at 345. And it affirmed dismissal where the plaintiffs had already amended once, where the amended complaint stated that it " 'identified all of the facts uncovered' " by investigation, and where the case had been pending "for over a year and a half." *Id.* at 346. None of those conditions obtains here. Nor need the SAC plead which Abbott employees held the intent not to pay: Rule 9(b) provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," and the SAC alleges that Abbott "knew these representations were false when made." SAC ¶ 126.

Connexions does not suggest that it is unable to identify the individuals. Its own management attended these meetings. The SAC pleads the assurance as Abbott's because it was Abbott's to make and Abbott's to honor, and because Rule 9(b) asks for notice of the misconduct rather than a roster of attendees. Should the Court nonetheless conclude that Count Nine must name the particular Abbott personnel who spoke, that is a curable pleading matter and Connexions can supply the names on amendment. The remedy is leave to replead, not dismissal with prejudice. *See* Point VII, *infra*.

### D. ABBOTT'S PROMISE IS ACTIONABLE BECAUSE ABBOTT NEVER INTENDED TO HONOR IT.

Abbott argues that its assurance was "a promise of future action rather than a misrepresentation of existing fact" and therefore not actionable. Def.'s Br. at 17. Abbott's own authority, however, states the exception that defeats the argument. In *Coastal Group Coastal Group, Inc. v. Westholme Partners*, No. 94-3010, 1996 WL 33545605 (D.N.J. Oct. 3, 1996), this

Court explained that "under New Jersey law . . . '[a] promise to pay in the future is fraudulent if there is no present intent ever to do so' – the theory being that, in making such a promise, the defendant misrepresented the fact of its then-existing intent not to fulfill its promise." *Coastal Group, Inc.*, No. 94-3010, 1996 WL 33545605, at *9 (D.N.J. Oct. 3, 1996) (quoting *Van Dam Egg Co. v. Allendale Farms, Inc.*, 199 N.J. Super. 452, 457 (App. Div. 1985)).

The SAC pleads that state of mind directly: Abbott "had no intention of providing additional compensation for the expanded work without a formal, written change order, which it refused to provide." SAC ¶ 127; *accord id.* ¶ 59. It is also supported circumstantially. At the same time Abbott was assuring Connexions it would be paid, Abbott was refusing the change order it knew was required, *id.* ¶¶ 59, 61; refusing to allow the project to be paused until the scope changes were "formally recognized and funded," id. ¶ 56; and after Connexions had hired additional staff and done the additional work, taking the position that "all of the expanded work and the additional staff that Connexions had hired was within the original scope of the project and existing task order," *id.* ¶ 61.

That is precisely how this Court found the exception satisfied in *Fimbel*. Minority shareholders of a closely held family corporation alleged that, on the eve of the closing of a sale of the corporation's real property for approximately $4.2 million, the controlling shareholder – "[i]n an effort to appease the shareholders" – assured them that the value of their shares would rise and that dividends would be paid soon after closing. *Fimbel*, 2014 WL 6992004, at *1, *4. No dividends were ever paid. Instead, later that same year, the controlling shareholder used the corporation's funds to make an unauthorized, unsecured and unrecorded loan to his own son. *Id.* at *1. The defendants moved to dismiss on exactly the ground Abbott presses here: that the dividend statement was a non-actionable promise of future performance. *Id.* at *4.

The Court accepted the general rule – "[a]n alleged fraud cannot be predicated solely on a promise of future performance that, in the end, goes unfulfilled" – but held the exception applied and denied the motion. *Id.* Taking the elements in turn, the Court held that the promisor's "subsequent conduct – refusing to fulfill his promise to pay dividends despite loaning [the corporation's] money to his son . . . later that year – is circumstantial evidence of [his] false state of mind and enough to meet the first element of common-law fraud under the Rule 12(b)(6) standard." *Id.* at *5. On knowledge of falsity, the allegation that "instead of using [corporate] funds to provide dividends, [the defendant] used [corporate] funds to make loans to his son . . . may demonstrate knowledge or belief by [the defendant] of the falsity of his material representation." *Id.* On intent to induce reliance, the phrase "[i]n an effort to appease the shareholders" sufficed. *Id.* (internal quotation marks omitted). On reliance and damages, general allegations that the plaintiffs relied and sustained "substantial damages" sufficed. *Id.* (internal quotation marks omitted). The Court then held Rule 9(b) satisfied and denied the motion as to the fraud count. *Id.*

*Fimbel* is equally instructive for what it rejected. The same defendant's companion statement – that the shareholders' shares would increase in value after the sale – failed, but not because it concerned the future. It failed because it was too vague and, decisively, because the plaintiffs "d[id] not claim anywhere in the Amended Complaint that [the] statement [wa]s actually false." *Id.* at *5 n.8. The line *Fimbel* draws is between a vague prediction never alleged to be false and a specific commitment alleged to have been made with a contemporaneous intention not to honor it.

Connexions' allegations fall on the actionable side of that line. The promise is specific: not "dividends," but additional compensation for an identified body of work – the vastly expanded

phase five and the additional staff Abbott itself had demanded – payable by Abbott directly if Dell did not pay. SAC ¶¶ 58, 125. The falsity is alleged directly rather than left to inference: Abbott "knew these representations were false when made," *id.* ¶ 126, and "had no intention of providing additional compensation for the expanded work without a formal, written change order, which it refused to provide," *id.* ¶ 127. And the circumstantial evidence of Abbott's state of mind is at least as strong as a loan to a son. In *Fimbel*, the promisor spent on someone else the money he had promised the plaintiffs. Here Abbott withheld the one instrument – the written change order – that could have funded the very payment it was promising, *id.* ¶¶ 59, 61, while directing Connexions to hire additional staff and refusing to let the project pause until the scope changes were "formally recognized and funded," *id.* ¶¶ 56, 58. Contemporaneous refusal to create the mechanism of payment is circumstantial evidence of an intention never to pay.

*Coastal Group* dismissed the fraud count there for a reason that has no analogue here. The inquiry is temporal: a plaintiff must show "that at the time the promise to perform was made, the promisor did not intend to fulfill the promise." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1186 (3d Cir. 1993). The *Coastal Group* plaintiff's own allegations "affirmatively contradicted" that inference, because the defendants there had "honored their commitments to plaintiff for over a year by reimbursing plaintiff's construction costs and overhead and by advancing adequate funds for the construction and delivery of twenty-nine new homes." *Coastal Group Inc.*, 1996 WL 33545605, at *9. The facts pleaded therefore "suggest[ed] that, at the time the promises were made (and for at least a year thereafter), defendants had every intention of fulfilling the promises that induced plaintiff" to convey its interest and continue work at the site. *Id.* at *10. Abbott points to no comparable performance. The SAC alleges the opposite: Abbott never approved any additional funding at all. SAC ¶¶ 61, 63.

**E. REASONABLE RELIANCE IS A FACT-SENSITIVE QUESTION NOT RESOLVABLE ON THE PLEADINGS.**

Abbott asks the Court to hold, as a matter of law and before any discovery, that a "sophisticated IT consulting firm" could not reasonably have relied on the end client's repeated assurances. Def.'s Br. at 18-19. Abbott's own authorities show why that request should be refused.

*Alexander v. CIGNA Corp.*, 991 F. Supp. 427 (D.N.J. 1998) was decided on summary judgment after discovery, on a developed record. *Fleming Cos. v. Thriftway Medford Lakes, Inc.*, 913 F. Supp. 837 (D.N.J. 1995) was also decided on summary judgment, and the reliance holding turned on facts with no counterpart here: the plaintiffs held the very lease documents whose terms they claimed to have misunderstood, and over roughly fifteen years never had them reviewed by counsel. *Id.* at 844-845. And *In re Prudential Insurance Co. of America Sales Practices Litigation*, 975 F. Supp. 584 (D.N.J. 1996) involved oral statements contradicted by written materials the plaintiffs had received from the defendant itself. *Id.* at 599-601. *In re Prudential* also supplies the limiting principle Abbott omits: "if the written materials are to provide notice that prior or concurrent oral statements are fraudulent, they must contradict those representations directly." *Id.* at 600.

No writing directly contradicts what Abbott is alleged to have said. Abbott's argument reduces to the proposition that because the Task Order named Norwin as the payor and contained no contingency language, Connexions could not reasonably credit Abbott's later, separate assurance that Abbott would pay for work outside that Task Order. But an instrument that fixes Norwin's obligation for in-scope work says nothing at all about who will pay for work the same instrument does not cover. Silence is not contradiction. And New Jersey courts routinely treat the reasonableness of reliance as a question for the factfinder. *Pop's Cones, Inc. v. Resorts Int'l*

*Hotel, Inc.*, 307 N.J. Super. 461, 472 (App. Div. 1998) ("whether plaintiff's reliance upon defendant's assurances was reasonable is also a question for the jury"). Abbott held the information, Abbott controlled whether the scope changes would be funded, and Connexions raised the issue repeatedly and was told it would be paid. SAC ¶¶ 56-58, 61.

## III. CONNEXIONS HAS PLAUSIBLY ALLEGED AN IMPLIED-IN-FACT CONTRACT WITH ABBOTT (COUNT TEN).

### A. *MK STRATEGIES, LLC v. ANN TAYLOR STORES CORP.* – ABBOTT'S OWN LEAD CASE – DENIED DISMISSAL ON MATERIALLY IDENTICAL ALLEGATIONS.

Abbott tells the Court that "*MK Strategies, LLC v. Ann Taylor Stores Corp.* is on point," and that "[t]he court dismissed MK Strategies' breach of contract claim against Ann Taylor, holding that 'simple direction and supervision by a third party does not provide the legal basis of a breach of contract claim against the third party.' " Def.'s Br. at 21-22. *MK Strategies* is, indeed, on point Unfortunately, though, for Abbott, the court did not dismiss the breach of contract claim in that case. It denied Ann Taylor's motion to dismiss in its entirety: "the Court will deny Ann Taylor's motion to dismiss MK Strategies' Amended Complaint and will deny Ann Taylor's motion for a more definite statement." *MK Strategies, LLC*, 567 F. Supp. 2d at 737.

The sentence Abbott quotes disposed of one of MK's two contract theories. The Court did reject MK's contention that Ann Taylor's supervision and direction of the work, standing alone, created a contractual relationship between MK Strategies and Ann Taylor. *Id.* at 735. It then, however, held that MK Strategies had sufficiently pleaded a contract claim on a different basis – Ann Taylor's promise:

> The Court can reasonably infer from the Amended Complaint that Ann Taylor's alleged promise to pay MK directly for any payment owed under the Tower subcontract not otherwise paid by Tower was relied upon by MK when it released the source code to Ann Taylor.

> . . .
>
> Therefore, MK has pled the requisite elements of a breach of contract claim. Whether the facts developed during discovery will support a breach of contract claim must await further proceedings.

*Id.* at 735-736.

Count Ten does not rest on direction and supervision alone. It alleges that Abbott "unilaterally expanded the project scope far beyond the Task Order, directly instructed Plaintiff to hire more staff, and promised to pay for the extra work and expenditures"; that Connexions "by performing the additional work and hiring staff in response to these direct requests and promises, accepted Abbott's offer"; that "[t]his course of dealing created a new, implied agreement for the additional work that was separate from the original Task Order"; and that Abbott "breached this implied contract by accepting the benefit of the work and then failing to pay for it." SAC ¶¶ 132-135.

More than that, Connexions pleads the very allegation that carried the contract claim in *MK Strategies*. What this Court held sufficient there was MK Strategies' allegation that "Ann Taylor, through its authorized representatives, promised to make payment directly to MK Strategies for its work under the Tower subcontract, if MK Strategies was not paid by Ann Taylor through Tower." *MK Strategies, LLC*, 567 F. Supp. 2d at 734. Connexions alleges – in a paragraph Count Ten expressly incorporates, SAC ¶ 131 – that Abbott "assured Connexions that it would receive additional compensation for the increased work and expenditures directly from Abbott if it did not receive it from Dell." SAC ¶ 58. Those are the same allegation: a promise by the project owner, made directly to the subcontractor, to pay the subcontractor itself if the intermediary did not. That promise – not direction and supervision – is what took MK Strategies' claim past the pleadings, and it is what takes Count Ten past the pleadings here.

One other part of *MK Strategies* holding is worth the Court's attention. Ann Taylor moved in the alternative under Rule 12(e) for a more definite statement, asking that MK Strategies be required to plead "(1) an identification of the authorized representatives of Ann Taylor; (2) the terms of the alleged agreement; (3) the date of the alleged promises; (4) the location of the exchange; (5) the reason Ann Taylor was willing to make this agreement . . . ; and (6) the means by which the promise was conveyed." *MK Strategies, LLC*, 567 F. Supp. 2d at 736. That is, item for item, the list Abbott presses here. The Court refused: "While not the model of particularity, MK's Amended Complaint is not so vague, ambiguous or unintelligible that Ann Taylor cannot respond in good faith. The details sought by Ann Taylor concerning MK's claims may be disclosed later in discovery, and if the such facts do not support MK's Amended Complaint, then Ann Taylor may later file a motion for summary judgment on this basis." *Id.* at 737.

### B. ABBOTT'S DEMAND FOR MATERIAL TERMS IS A DEMAND FOR A WRITTEN CONTRACT.

Abbott argues that the SAC "pleads no agreed-upon price, no billing rates, no payment schedule, no acceptance criteria for compensable work, no identification of which specific tasks were compensable, no duration, and no invoicing procedure." Def.'s Br. at 22-23. That is a demand for a written contract, not a pleading standard, and it would render the implied-in-fact doctrine a nullity. "Contracts are 'express' when the parties state their terms and 'implied' when the parties do not state their terms." *Baer v. Chase*, 392 F.3d 609, 616 (3d Cir. 2004).

"The rendition of services to another under circumstances which negate the idea that they were gratuitous, creates an obligation (implied from the circumstances) to pay what the services are reasonably worth; this is a contract implied in fact." *Wanaque Borough Sewerage Authority v. Township of West Milford*, 281 N.J. Super. 22, 29 (App. Div. 1995) (citing *Shapiro*, 42 N.J. Super. at 383), *aff'd in part, rev'd in part on other grounds*, 144 N.J. 564 (1996). Such a contract

"is, in legal effect, an express contract, in the sense that the parties' agreement is inferred by law, as a matter of reason and justice, from their conduct, or from the circumstances surrounding their relationship." *Id.* at 29. Because the agreement is inferred from conduct, the test is objective and contextual: "[a] promise to pay for services rendered by [the] plaintiff can be inferred from the parties' conduct and relationship if, when objectively viewed, they reveal that [the] defendant should have realized that [the] plaintiff would expect reimbursement for those services." *Id.* at 30. A party told in so many words that the work exceeded the Task Order and would require additional compensation, SAC ¶ 58, that responds by directing the contractor to hire more staff and keep going, *id.*, should have realized that reimbursement would be expected.

This Court rejected the identical "precise contours" argument in *Comprehensive Spine Care, P.A. v. Oxford Health Insurance, Inc.*, No. 18-6520, 2018 WL 6445593 (D.N.J. Dec. 10, 2018), holding that a breach of implied contract claim survives where the plaintiff alleges a contract formed "through Defendants' course of conduct and interaction with Plaintiff," a failure to pay, and damages, and that the plaintiff was "entitled to discovery to demonstrate how the parties would have understood or measured the price term in their alleged agreement." *Id.* at *5.

*Baer*, 392 F.3d 609, Abbott's definitiveness case, says more than Abbott lets on: "[a]n agreement lacking definiteness of price . . . is not unenforceable if the parties specify a practicable method by which they can determine the amount." *Baer*, 392 F.3d at 619. The SAC supplies such a method. The Task Order fixed $3,310,649.00 across 23 defined phases, the first five of which carried an allocated value of $960,088.21 – supplying a per-phase valuation from which the value of additional work of the same character can be computed. SAC ¶¶ 37, 42-43, 69. The SAC also invokes "the reasonable value of the uncompensated services rendered," *id.* ¶ 136, and "fair market value," *id.* ¶¶ 68, 121. Whether those measures are practicable is a question for

discovery and proof. And notably, *Baer* was decided on summary judgment; indeed, the passage Abbott quotes begins, "[n]othing in the record indicates." *Baer*, 392 F.3d at 621. *Genesis Laboratory Management LLC v. United Healthcare Services, Inc.*, No. 21-12057, 2025 WL 325840 (D.N.J. Jan. 29, 2025), Abbott's other authority, was decided on a complaint alleging nothing more than a three-month period of payment as a "course of conduct," with no allegation of any request, direction, or promise by the defendant. *Id.* at *6. Here, by contrast, Abbott is alleged to have demanded the work, demanded the staffing, and promised the payment.

*Kernahan v. Home Warranty Administrator of Florida, Inc.*, 236 N.J. 301 (2019), adds nothing. It concerned whether a consumer had knowingly assented to an arbitration provision that was captioned "MEDIATION," internally contradictory, and printed in 6.5-point type; the Court held assent lacking because "the contract contains material discrepancies that call into question the essential terms of the purported agreement to arbitrate." *Id.* at 327. *Kernahan* says nothing about the level of detail required to plead a contract implied in fact.

### C. THE STATUTE OF FRAUDS DOES NOT BAR COUNT TEN ON THE PLEADINGS.

Abbott argues that Abbott's alleged promise "describes a classic suretyship" barred by the Statute of Frauds, N.J.S.A. § 25:1-15. Def.'s Br. at 23-24. That argument fails at three levels.

First, the Statute of Frauds is an affirmative defense. Although it "properly may be raised in the context of a motion to dismiss," such a motion "may be granted, however, only if it is clear from the face of the complaint or the documents attached thereto that the statute of frauds presents an insurmountable bar to plaintiff's cause of action." *Coastal Group Inc.*, 1996 WL 33545605, at *4. Nothing on the face of the SAC establishes such a bar.

Second, the promise as pleaded is not a suretyship. "Suretyship is a contractual relation resulting from an agreement whereby one person, the surety, engages to be answerable for the

debt, default or miscarriage of another, the principal." *Amelco Window Corp. v. Fed. Ins. Co.*, 127 N.J. Super. 342, 346 (App. Div. 1974). The Statute of Frauds reaches a promise to answer for a debt "for which a third party is and continues to be primarily liable." *Sapta Global, Inc. v. Cilicorp*, LLC, No. 13-3698, 2015 WL 1469600, at *5 (D.N.J. Mar. 30, 2015) (quoting *Howard M. Schoor Associates, Inc. v. Holmdel Heights Constr. Co.*, 68 N.J. 95 (1975)). But the SAC does not allege that Dell was ever primarily liable for the out-of-scope work. It alleges that Dell and Abbott both refused to issue the change order that would have obligated anyone to pay for it, SAC ¶ 59, and that Abbott later refused to approve "any change in scope or additional funding," *id.* ¶ 61. A promise to pay for work the promisor itself demanded, where no one else is primarily liable for it, is an original promise, not a collateral one.

Third, even if the promise were collateral, the leading-object exception applies. In *Howard M. Schoor Associates, Inc. v. Holmdel Heights Const. Co.*, 68 N.J. 95 (1975), the New Jersey Supreme Court adopted the common law "leading object" exception to the Statute of Frauds, articulating the exception as follows: "[W]hen the leading object of the promisor is to subserve some interest or purpose of [the promisor's] own, notwithstanding the effect is to pay or discharge the debt of another, [the] promise is not within the statute." *Id.* at 102 (quoting 2 Corbin on Contracts, § 366 (1950)).

*Sapta Global*, 2015 WL 1469600 found the exception inapplicable for a reason that is the mirror image of this case: "Most fundamentally, Sapta has not even alleged that Tenende was acting in his own interest when he made the alleged guaranty. Neither Sapta's Complaint nor its affidavit in support of its motion makes any allegation as to Tenende's motivation for guaranteeing Cilicorp's debt." *Id.* That was on a default judgment record, with "no input from Tenende himself" and none from the plaintiff either. *Id.*

The allegations in the SAC make clear that the primary reason for Abbott making that promise was to serve the promisor's (i.e., Abbott's) own economic interest or benefit and thus the promise does not need to be in writing to be enforceable. Abbott needed the UNIX-to-Linux migration completed at its data centers. SAC ¶ 7. Abbott itself had "kept increasing the scope of the work," *id.* ¶ 25, "constantly changed the scope of work," *id.* ¶ 49, and "repeatedly and unilaterally expanded" phase five, *id.* ¶ 55. Abbott knew Connexions was asking that the project be paused until the scope changes were funded, *id.* ¶ 56, and that Connexions' management was weighing "suspension or withdrawal from the project," *id.* ¶ 64. Abbott made its assurance in order "to induce Plaintiff to continue performance . . . thereby ensuring the project continued without interruption for Abbott's benefit." *Id.* ¶ 128. Keeping one's own half-finished data-center migration moving is the paradigm of a promisor subserving "some interest or purpose of his own."

Finally, whether the exception applies is a fact question unsuited to the pleadings: "In applying this rule the finder of fact must examine all circumstances bearing upon the transaction, the relationship of the parties to one another and endeavor to discern the intent, purpose and object of the promisor." *Howard M. Schoor Associates, Inc.*, 68 N.J. at 104 (1975).

### D. CONNEXIONS NEED NOT PLEAD AN AGENT'S AUTHORITY WITH PARTICULARITY.

Abbott argues that Count Ten fails because Connexions "never identifies who at Abbott purportedly had the authority" to bind it. Def.'s Br. at 24. Its sole authority for this argument is *Atchison v. Sears*, 666 F. Supp. 2d 477 (E.D. Pa. 2009), which does not even support dismissal on the pleadings.

*Atchison* is worth addressing, because neither its facts nor its reasoning has anything to do with this case. Gerard Atchison ("Atchison") was an HVAC project coordinator at a Sears

subsidiary. *Id.* at 483. When he was hired in July 2005 he signed – and separately initialed – an "All-In-One Acknowledgment Form" providing that he was "employed under the Employment-At-Will doctrine" and that "[n]o supervisor, department head, or other member of management, except for the Senior Leadership Team acting at the direction of the VP/GM, has the authority to bind the company to any employment contract for any specific period of time with any associate, either verbally or in writing." *Id.* at 484, 496. Two years later, at the conclusion of a medical leave, a human-resources representative sent him a pre-printed form captioned "FMLA LEAVE EXPIRATION NOTICE," which told him that his federal leave entitlement had expired, that he might be eligible for additional state leave, and that he "will be entitled to job protection for additional leave." *Id.* at 484 (internal quotation marks omitted). Ten months later he was terminated in a company-wide reduction in force. *Id.* at 485.

His breach of contract claim was that this form notice was itself a contract – that by sending it, Sears "guaranteed, agreed and/or contracted" that he "would be entitled to job protection for additional leave." *Id.* at 496 (internal quotation marks omitted). The court granted summary judgment, and the reasoning is what matters. Pennsylvania presumes that employment is at-will, and "there is a very strong presumption of at-will employment relationships and the level of proof required to overcome this presumption is arduous." *Id.* (citation omitted). Measured against that presumption, the claim failed on four independent grounds. The representative who signed the notice lacked authority to alter the relationship. *Id.* at 497-498. There was no mutual understanding, because a form reciting statutory leave rights "far from evidences a clear intent by Sears to be bound," and "[a]t most, the document was broadly reciting Atchison's rights according to the FMLA and any applicable Sears policy." *Id.* at 498. There was no consideration, because the only benefit Atchison identified was "[t]he benefit the

defendants derived from the Plaintiff was his continued employment," and Pennsylvania requires "a substantial benefit other than the services which the employee is hired to perform." *Id.* at 499 (citation omitted). And the supposed agreement lacked definite terms: it fixed no duration and never defined "job protection" or "additional leave." *Id.* at 499-500.

Only the first of those grounds is the one Abbott invokes, and it rested entirely on the form Atchison had signed. Actual authority failed on the evidence: "Atchison has not pointed to any evidence that Franks had the express authority to enter into employment contracts, or modify the employment-at-will status of Sears's employees," and "[t]he fact that she had the ability to sign-off on a Human Resources form like the FMLA Notice did not give her express or implied authority to alter employment relationships in this manner." *Id.* at 497. Apparent authority failed for a reason peculiar to that record. The rule is that "a third party cannot rely on the apparent authority of an agent to bind a principal if he has knowledge of the limits of the agent's authority" – and Atchison had "crystal clear knowledge" of those limits, because he had signed and initialed the very document that spelled them out. *Id.* at 497-498.

None of that reaches this case. *Atchison* was decided at summary judgment on a developed record, and the authority holding is an evidentiary ruling – the plaintiff "has not pointed to any evidence" – not a pleading rule. It applied Pennsylvania employment-at-will law, which supplies an "arduous" presumption against contract formation that has no counterpart in a commercial dispute between two companies over payment for services actually rendered. The instrument at issue was a pre-printed HR form reciting statutory rights, not a commitment made face to face in negotiations over a live dispute. And the fact that decided the apparent-authority question – a signed acknowledgment telling the counterparty precisely who could and could not bind the company – has no analogue here. Abbott points to no writing, and none appears in the

SAC, by which Abbott ever told Connexions that its representatives lacked authority to commit it.

If anything, *Atchison* confirms that what Abbott raises is a question of fact. The same passage Abbott relies on states the governing rule: "[a]pparent authority exists where a principal, by words or conduct, leads people with whom the alleged agent deals to believe that the principal has granted the agent the authority he or she purports to exercise." *Id.* at 497-498 (citation omitted). The SAC alleges precisely such words and conduct by Abbott. Abbott sent representatives to repeated management-level meetings with Connexions' management team over a four-month period for the express purpose of addressing the scope increases, SAC ¶ 57; those representatives directed Connexions to continue performing and to hire additional staff, and assured Connexions that Abbott would pay it directly if Dell did not, *id.* ¶ 58. Whether the people Abbott chose to send had authority to say what they said is a question to be answered with evidence, not on the pleadings.

Rule 8 does not require a plaintiff to plead an agent's authority with particularity, and Abbott cites no case holding that it does. *MK Strategies* is again instructive: the plaintiff there alleged only that "authorized representatives" of Ann Taylor made the promise, without naming any of them, and this Court held the allegation sufficient and refused Ann Taylor's request that MK Strategies be made to identify them. *MK Stategies, LLC*, 567 F. Supp. 2d at 734, 736-737. Which Abbott personnel attended the January-through-April 2025 meetings, and what authority they carried, are matters for discovery.

## IV. THE COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM SURVIVES WITH THE CONTRACT CLAIM (COUNT ELEVEN).

Abbott makes two arguments against Count Eleven, both derivative. First, Abbott says the covenant claim fails because there is no contract. Def.'s Br. at 25. That argument rises and

falls with Point III. The covenant of good faith and fair dealing is implied in every New Jersey contract, including one implied in fact. *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 420 (1997); *Palisades Props., Inc. v. Brunetti*, 44 N.J. 117, 130 (1965). If Count Ten survives, Count Eleven survives with it. That is precisely how this Court resolved the identical argument in *Coastal Group*: because the defendants had "not demonstrated that there is no set of facts on which plaintiff could prove the existence of the various contracts alleged," the Court "correspondingly must deny defendants' motion with respect to" the good-faith count. *Coastal Group, Inc.*, 1996 WL 33545605, at *7.

Second, Abbott says the claim is duplicative because Connexions identifies no bad-faith conduct "distinct from the very conduct alleged to constitute a breach." Def.'s Br. at 25-26. Rule 8(d)(3) permits a plaintiff to plead as many claims as it has "regardless of consistency," and *Wade v. Kessler Institute*, 172 N.J. 327 (2002) – Abbott's authority – addressed the availability of the theory on a full trial record, not the permissibility of pleading it in the alternative at the outset. In any event, the SAC does allege bad-faith conduct distinct from non-payment. It alleges that Abbott directed Connexions' personnel to falsify training completion records, SAC ¶ 47; that Abbott expanded phase five from four weeks to seventeen unilaterally, *id.* ¶ 55; that Abbott refused to permit the project to be paused until the scope changes were "formally recognized and funded," *id.* ¶ 56; that Abbott directed Connexions to hire additional staff while knowing it "had no intention of providing additional compensation," *id.* ¶¶ 58-59; and that Abbott then took the position that all of the expanded work had been within the original scope all along, *id.* ¶ 61. Conduct designed to extract performance while withholding the mechanism that would make payment possible is quintessential bad faith, and it is analytically distinct from a simple failure to pay.

## V. CONNEXIONS HAS SUFFICIENTLY PLED PROMISSORY ESTOPPEL (COUNT TWELVE).

Promissory estoppel requires "(1) a clear and definite promise, (2) made with the expectation that the promisee will rely upon it, (3) reasonable reliance upon the promise, (4) which results in definite and substantial detriment." *East Orange Board of Education v. New Jersey Schools Schools Construction Corporation*, 405 N.J. Super. 132, 148 (App. Div. 2009) (internal quotation marks and citations omitted). Abbott challenges the doctrine's availability and three of the four elements. Each challenge fails.

Abbott first argues that promissory estoppel "is a gap-filling doctrine that is unavailable where a valid written agreement already governs the same subject matter," citing *Hillsborough Rare Coins, LLC v. ADT LLC*, No. 16-916, 2017 WL 1731695 (D.N.J. May 2, 2017). Def.'s Br. at 26. As pointed out above, a stranger to a contract cannot invoke that contract to bar quasi-contract claims against itself. Indeed, in *Hillsborough Rare Coins, LLC*, the express contract was between the plaintiff and the defendant. *Hillsborough Rare Coins, LLC*, 2017 WL 1731695, at *2, *6. The court's reasoning was expressly that "an express contract excludes an implied one" between the same parties, and that "when an express contract exists, it controls, and courts should not create an implied contract governing the same agreement." *Id.* at *7. Here, there is no express contract between Connexions and Abbott. For the reasons set forth in Point I.A, a stranger to the Norwin agreements cannot invoke them to bar quasi-contract claims against itself, and for the reasons in Point I.B, those agreements do not reach the out-of-scope work in any event.

With respect to the first element of promissory estoppel – a clear and definite promise – Abbott argues that the SAC pleads only "vague 'assurances' " with no "amount or rate to be paid, the deliverables or work covered, the conditions for payment, or the duration." Def.'s Br. at 27. That argument applies a version of the first element that New Jersey law does not apply. That

argument applies a version of the first element of a promissory estoppel claim that New Jersey law does not apply. In *Pop's Cones, Inc. v. Resorts International Hotel, Inc.*, 307 N.J. Super. 461 (App. Div. 1998), the Appellate Division relaxed the requirement of a clear and definite promise, and held that promissory estoppel requires only "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee." *Id.* at 463, 471-472.

That is this case. Count Twelve does not ask the Court to enforce a fully specified agreement between Connexions and Abbott; Connexions pleads such an agreement in the alternative, as Count Ten. What Count Twelve seeks is the loss Connexions sustained by relying on Abbott's assurance – the expanded work it performed and the staff it hired rather than pausing or withdrawing from the project. SAC ¶¶ 144-145. Abbott's demand that the promise fix a rate, a payment condition and a duration is a demand that Connexions prove a contract in order to recover for not having one. The doctrine exists to reach the case in which the parties never reduced those terms to paper.

The facts of *Pop's Cones* show how far the relaxed "clear and definite" promise standard reaches. In that case, a TCBY franchisee operating in Margate, New Jersey negotiated with a casino hotel to relocate its store to the hotel's Boardwalk property in Atlantic City. *Id.* at 463-464. In late September 1994, the hotel's executive director of business development told the franchisee's president that the parties were "95% there" and needed only the chief operating officer's signature, assured her that the officer would follow his recommendation to approve the deal, and instructed her to give notice that the franchisee would not extend its Margate lease and to "pack up the Margate store and plan on moving." *Id.* at 465, 472. In reliance, the franchisee let its lease lapse, vacated, placed its equipment in storage, retained counsel, and planned the

relocation. *Id.* at 472. The hotel sent a written proposal on December 1, 1994, then withdrew it on January 30, 1995, leaving the franchisee without a location for more than a year. *Id.* at 466-467. The trial court granted the hotel summary judgment on precisely the reasoning Abbott presses here: that even if a lease had been promised, the promise lacked specificity as to term, starting date and rent, and so could not satisfy the first element of a promissory estoppel claim. *Id.* at 467-468. The Appellate Division reversed, holding that the franchisee had presented a prima facie claim sufficient to reach a jury. *Id.* at 473. If a promise carrying no price, no duration and no conditions survived summary judgment after full discovery, Abbott's assurance survives a motion to dismiss. That assurance identifies the payor (Abbott), the trigger (non-payment by Dell), and the work covered – the expanded phase five and the additional staff Abbott had already demanded. SAC ¶¶ 58, 142.

Even on the stricter formulation Abbott urges, its argument mistakes the stage of the case: definiteness is measured here by the allegations, not by the evidence. This Court made the point squarely in *Coastal Group, Inc.*, 1996 WL 33545605, rejecting reliance on *Malaker Corp. v. First Jersey National Bank*, 163 N.J. Super. 463 (App. Div. 1978) – a judgment n.o.v. case – as "misplaced" on a motion to dismiss: "Here, the sufficiency of plaintiff's evidence is not at issue. Rather, because on a motion to dismiss, this court may examine only the sufficiency of the allegations contained in plaintiff's complaint, this court must conclude that sufficiently clear and definite promises have unquestionably been alleged." *Malaker Corp.*, 1996 WL 33545605, at *6. The promises held sufficient there were that the defendants would "assume any and all outstanding trade payables of the project" and that "plaintiff would be receiving an overhead reimbursement and profit participation out of its continued involvement in the development of the project" – no rate, no schedule, no cap. *Id.*

Abbott's cases are not to the contrary. *Haghighi v. Horizon Blue Cross Blue Shield of New Jersey*, No. 19-20483, 2020 WL 5105234 (D.N.J. Aug. 31, 2020), involved pleadings "entirely devoid of factual allegations that relate to a fixed or agreed-upon rate of compensation," *id.* at *6 – and, critically, the promise there was a pre-authorization, a document that says nothing about who pays or how much. Here the promise identifies the payor (Abbott), the trigger (non-payment by Dell), and the subject matter (the expanded scope and the additional staff). *East Orange Board of Education v. New Jersey Schools Construction Corporation*, 405 N.J. Super. 132 (2009) is further afield. It was an action in lieu of prerogative writs against State agencies, decided on a stipulated record, holding that estoppel cannot be used to redirect the allocation of scarce public school construction funds committed by statute to agency discretion. *Id.* at 145-148. The Board there had "merely articulated a general expectation that all of the projects in its [long range facilities plan] would be funded." *Id.* at 146-147. Here, Connexions alleges a specific promise made to it, in meetings, about identified work. And *Scagnelli v. Schiavone*, 538 F. App'x 192 (3d Cir. 2013), states the "sine qua non" formulation on an appeal from summary judgment, where the promise at issue – to "do something" or "take care of" the plaintiffs – was "vague in the extreme." *Id.* at 193-194 (internal quotation marks omitted).

With respect to the second element – expectation of reliance – of promissory estoppel, Abbott argues the SAC pleads no fact from which the Court could infer that Abbott expected Connexions to rely. Def.'s Br. at 28. The SAC alleges that a promise to pay was given in response to Connexions' statements that it "would require additional compensation," SAC ¶ 58; that it was accompanied by a direction to "continue performance and to bring on additional staff," *id.*; and that it was made "to induce Plaintiff to continue working, take on a vastly expanded scope, and hire additional staff," *id.* ¶ 143. A promise made in answer to a demand for payment, coupled

with an instruction to keep working, is a promise made with the expectation of reliance. Abbott's contrary argument – that its "position was that no expanded scope existed," Def.'s Br. at 28 – asks the Court to credit Abbott's version over the pleading.

With respect to the third element – reasonable reliance upon the promise – Abbott's reliance argument is the same one it makes against Count Nine and fails for the same reasons. *See* Point II.E, *supra*. The detriment is pleaded and quantified: Connexions "took on the additional work and expenditures, including the hiring of additional staff, rather than pausing or withdrawing from the project," SAC ¶ 144 – forgoing the alternative it had been actively considering, *id.* ¶¶ 56, 64 – and incurred $147,330.00 in unbudgeted training labor alone, *id.* ¶ 46, plus the cost of two unbudgeted on-site trips, *id.* ¶¶ 51-52, and thirteen additional weeks of phase-five work, *id.* ¶ 55. Reliance that forecloses a real alternative course of action is the paradigm of detrimental reliance. *Cf. Coastal Group, Inc.*, 1996 WL 33545605, at *6 ("Having alleged that it was induced to perform work for which it was never paid, plaintiff has alleged detrimental reliance, and has stated a claim under the doctrine of promissory estoppel.").

## VI. COUNT THIRTEEN SHOULD BE CONSOLIDATED WITH COUNT TWELVE, NOT DISMISSED.

Abbott argues that "detrimental reliance" is not a standalone cause of action but an element of promissory estoppel. Def.'s Br. at 29-30 (citing *Willekes v. Serengeti Trading Co.*, No. 13-7498, 2016 WL 5334522, at *12 (D.N.J. Sept. 22, 2016)). Abbott's own framing supplies the answer. If detrimental reliance is another name for promissory estoppel, Count Thirteen rises and falls with Count Twelve – and for the reasons set forth in Point V, Count Twelve states a claim. Notably, the court in *Willekes* dismissed the standalone count while construing it instead as an attempted promissory estoppel claim. *Id.* Redundancy between two counts pleading one theory is a question of trial management, not a pleading defect. Should the Court prefer that the

counts be consolidated, Connexions does not object and respectfully requests leave to replead them as a single count rather than dismissal of either.

## VII. ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE.

Abbott asks that all claims against it be dismissed "with prejudice." Def.'s Br. at 30. It offers no argument for that relief – the words appear only in the concluding sentence. A complaint should be dismissed with prejudice only where further amendment would be inequitable or futile. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). Abbott has made no showing of either.

Every deficiency Abbott identifies is, by Abbott's own description, a pleading deficiency: who spoke, when and where, what terms the parties agreed upon, what authority the speaker held, what benefit Abbott received. Those are quintessentially curable, which is why courts in this District ordinarily dismiss such counts without prejudice and with leave to replead. This is also the first occasion on which any court has evaluated the sufficiency of Connexions' pleading; the prior amendments were made in state court before removal and did no more than correct the defendants' corporate names. Should the Court conclude that any count against Abbott is deficient – in particular, that Count Nine must name the individual Abbott representatives who made the assurances alleged in SAC ¶¶ 57-58 – Connexions respectfully requests leave to replead rather than dismissal.

## <u>CONCLUSION</u>

For the foregoing reasons, Connexions respectfully requests that the Court deny Abbott's motion to dismiss the Second Amended Complaint. In the alternative, should the Court dismiss any claim against Abbott, Connexions respectfully requests that such dismissal be without prejudice and with leave to amend.

Respectfully submitted,

**LAW OFFICES OF USMAAN SLEEMI LLC**
Attorneys for Plaintiff

*/s/ Usmaan Sleemi*
Usmaan Sleemi, Esq

**CERTIFICATE OF SERVICE**

I, USMAAN SLEEMI, hereby certify that, on October 5, 2026, the foregoing Plaintiff's Brief in Opposition to Abbott's Motion to Dismiss Plaintiff's Second Amended Complaint was electronically filed and served through the Court's CM/ECF system upon the following counsel of record:

Abigail S. Badway, Esq.
Benesch, Friedlander, Coplan & Aronoff LLP
1155 Avenue of the Americas
26th Floor
New York, NY 10036
Abadway@beneschlaw.com
*Attorneys for Defendant Abbott Laboratories, Inc.*

Christopher J. Borchert, Esq.
Alston & Bird LLP
90 Park Avenue
15th Floor
New York, NY 10016
Christopher.Borchert@alston.com
*Attorneys for Defendant Dell Marketing L.P.*

Theodora T. McCormick, Esq.
Baker, Donelson, Bearman, Caldwell, & Berkowitz, PC
281 Witherspoon Street
3rd Floor
Princeton, NJ 08540
tmccormick@bakerdonelson.com
*Attorneys for Defendant Norwin Technologies LLC*

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, then I may be subject to punishment.

*/s/ Usmaan Sleemi*
Usmaan Sleemi, Esq.